IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SHANNA EILEEN MARIE MEYER,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:20-CV-01763-JJH<br><br>JUDGE JEFFREY J. HELMICK<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Shanna Eileen Marie Meyer ("Ms. Meyer") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision deny disability insurance benefits ("DIB"). (ECF #1). This Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 11, 2020, pursuant to Local Rule 72.2, this matter was referred to a magistrate judge for preparation of a report and recommendation, and was reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 20, 2021). Following review, and for the reasons stated below, I recommend the Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Meyer filed for DIB on July 23, 2018, alleging a disability onset date of February 4, 2016. (Tr. 66). Her claims were denied initially and on reconsideration. (Tr. 65-81, 83-103). She

then requested a hearing before an administrative law judge. (Tr. 124-25). Ms. Meyer (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 28, 2019. (Tr. 36-64). On November 8, 2019, the ALJ found Ms. Meyer not disabled in a written decision. (Tr. 12-35). The Appeals Council denied Ms. Meyer's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6). *See* 20 C.F.R. §§ 404.955 & 404.981. Ms. Meyer timely filed this action on August 11, 2020. (ECF #1).

FACTUAL BACKGROUND

I.  ADMINISTRATIVE HEARING

Ms. Meyer, with her counsel, appeared before the ALJ on October 28, 2019. (Tr. 38). Also present at the hearing was VE James Fuller. (*Id.*).

The ALJ permitted Ms. Meyer's attorney to take over the examination and ask questions of Ms. Meyer. (Tr. 40). In response to her attorney's questioning, Ms. Meyer described her symptoms as being "constantly exhausted and in pain." (*Id.*). She attempts to do chores and other daily activities, but her exhaustion prevents her from completing these tasks. (*Id.*).

Ms. Meyer stated she has seen several doctors and specialists, including going to the Cleveland Clinic for services. (Tr. 41). Ms. Meyer has a diagnosis of narcolepsy, which may explain her exhaustion, but she may also have a rarer sleep disorder. (*Id*). None of the doctors she has seen have been able to find the root cause of Ms. Meyer's symptoms. (*Id.*).

Ms. Meyer testified to the numerous therapies she has attempted: medication, cranial sacral therapy, massage therapy, exercise, physical therapy, and aquatic therapy. (*Id.*). She has been unable to find any treatment that helps. (*Id.*). She has also experienced an unexplained 40-pound weight loss and is on medication to increase her appetite and help her gain weight. (Tr. 42).

Ms. Meyer has vision problems due to her migraines, which prevents her from driving safely. (Tr. 44). She has had difficulty attending treatments due to her inability to drive. (Tr. 45).

Ms. Meyer testified she has sole custody of her two daughters, ages nine and three at the time of the hearing. (Tr. 46-47). The eldest attends school Monday through Friday, while the youngest attends preschool on Tuesdays and Thursdays. (Tr. 47). Ms. Meyer watches her two daughters and makes sure their needs are met; however, both are independent and often able to care for themselves. (*Id.*). Her three-year-old daughter is able to get prepared food from the refrigerator, dress herself, and wash herself. (*Id.*). Ms. Meyer attempts to complete chores around the house, but is unable to complete more than one activity per day. (Tr. 49-50).

Ms. Meyer testified she can only stand for five to ten minutes before her feet begin to hurt, and can only walk for about a quarter mile before resting. (Tr. 51). Ms. Meyer began using a cane approximately one month before the hearing, due to dizziness. (Tr. 52)  Although she can lift items weighing under ten pounds, she is not able to carry things for risk of dropping them. (Tr. 51).

Ms. Meyer also described problems with concentration. She can only pay attention for less than a minute and must have instructions repeated several times before she understands what is said. (Tr. 51-52). She is unable to watch television with her children, as she cannot concentrate long enough to understand the program. (Tr. 52).

In her past jobs, Ms. Meyer worked as an accounting specialist, performing payroll, accounts receivable, answering the phone, and filing tasks. (Tr. 53). Although she has worked for different employers over the past ten years, all roles were substantially similar. (Tr. 54-56).

The VE then testified. The VE identified Ms. Meyer's past relevant work as:

- Accounting Clerk (DOT #216.4882-010): Skilled, SVP 5, Sedentary; and

- Composite Payroll Clerk/Cashier (DOT #215.382-014/211.462-010): Semiskilled, SVP 4, sedentary/unskilled, SVP 2, light.

(Tr. 57-58). The ALJ then posed the following hypothetical to the VE:

> [A]ssume that a hypothetical individual of the claimant's age, education and work experience has the residual functional capacity for work at the light exertional level, postural limitations of no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, occasional stooping, kneeling, crouching and crawling, manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling and fingering, environmental limitation to avoid concentrated exposure to hazards such as dangerous moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust and gases, work limited to simple, routine and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts involving only work-related decisions with few, if any, workplace changes, occasional interaction with the general public, coworkers and supervisors.

(Tr. 58-59). The VE testified such an individual would not be able to perform the identified past relevant work. (Tr. 59). However, the VE identified other jobs the individual could perform at the light exertional level:

- Sorting (DOT # 526.687-010), 160,000 in the national economy;

- Inspector (DOT #222.687-042), 60,000 in the national economy; and

- Packing/Bagging (DOT #920.687-018), 140,000 in the national economy.

(Tr. 59). The ALJ then asked the VE to identify jobs that could be performed at the sedentary level including a sit/stand option. (Tr. 59-60). Such jobs included:

- Inspector (DOT #669.687-010), 35,000 in the national economy;

- Sorting (DOT #521.687-086), 28,000 in the national economy; and

- Smoother/Sealer/Polisher (DOT #712.687-018), 40,000 in the national economy.

4

(Tr. 60). Finally, the ALJ asked the VE to add the following limitations to either exertional level hypothetical:

> Isolated work with occasional supervision, the hypothetical individual will consistently be allowed to take two extra breaks of 15 minutes each per eight hour work shift in addition to regularly scheduled breaks, the hypothetical individual consistently be absent more than 50% of the scheduled workdays per month and the hypothetical individual will consistently be off task more than 50% of the work period.

(*Id.*). The VE testified that no work would be available in the national economy for such an individual. (*Id.*). At most, employers would tolerate only ten percent off-task behavior, and one day per month absent. (Tr. 60-61).

## II. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Meyer was 31 years old on the alleged onset date of her disability; she was therefore defined as a younger individual age 18-49. (Tr. 65; *see also* 20 C.F.R. §§ 404.1563). Ms. Meyer had past relevant work as an accounting clerk, payroll clerk, and cashier; this work was "substantial gainful activity" under the Act, was performed long enough for Ms. Meyer to achieve average performance, and was performed within the relevant period. (Tr. 27; *see also* 20 C.F.R. § 404.1565). However, given her residual functional capacity ("RFC"), Ms. Meyer's past relevant work could no longer be performed. (Tr. 27). Accordingly, Ms. Meyer was unable to perform past relevant work as actually or generally performed. (*Id.*).

## III. RELEVANT MEDICAL EVIDENCE[1]

Ms. Meyer initially sought treatment for her migraine headaches in May 2017. (Tr. 392-93). She presented to the emergency department complaining of intermittent headaches for the past

---

[1]    Ms. Meyer only raises error with respect to her migraine headaches. (Pl.'s Br., ECF #13, PageID 1347-54). As such, she waives argument on issues not raised in the opening brief.

three weeks, despite taking over-the-counter medications. (Tr. 392). A CT scan was ordered, and results were normal. (Tr. 415). Ms. Meyer also complained of week-long headaches at her behavioral health appointment on July 26, 2017. (Tr. 390). This episode resulted in Ms. Meyer being bedridden for two days. (*Id.*).

Ms. Meyer sought treatment for her migraines from Christopher M. Hassett, D.O., on October 20, 2017. (Tr. 702). At the initial visit, Ms. Meyer stated she had experienced headaches for many years, and endorsed visual disturbance, nausea, and sound sensitivity. (*Id.*). An average headache lasts about three days, with 15 or more headache days experienced per month. (*Id.*). Average intensity of headaches is four to seven on a ten-point scale, with some reaching ten on the same ten-point scale. (*Id.*). Ms. Meyer was assessed with chronic migraine without aura, and a nonfocal exam.[2] (Tr. 703). Dr. Hassett began a medication regimen of Calan SR for preventative treatment and Imitrex as an abortive for headache onset. (*Id.*).

Ms. Meyer presented with little improvement at a follow-up appointment on December 20, 2017; she still experienced 15 or more headache days each month. (Tr. 705). The medication was not helpful in reducing her symptoms. (*Id.*). At this visit, Dr. Hassett diagnosed Ms. Meyer with

*Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). I therefore summarize only the records concerning her migraine condition.

[2] The Commissioner characterizes the "nonfocal" neurological examination as "normal." (Comm'r's Br., ECF #15, PageID 1360). Rather, a "nonfocal" exam can indicate a generalized neurological problem not specific to a certain area of the brain. *Focal neurologic deficits*, *National Library of Medicine MedlinePlus*, https://medlineplus.gov/ency/article/003191.htm (Nov. 23, 2021).

6

trigeminal neuralgia.[3] (Tr. 706). Dr. Hassett prescribed Topamax as preventative medication and naratriptan as abortive for her migraines. (Tr. 706-07).

On December 22, 2017, Ms. Meyer received supraorbital nerve block injections bilaterally, which she tolerated well. (Tr. 708-09). At follow-up on January 17, 2018, Ms. Meyer reported the nerve block injections helped her pain for about three weeks, but she had experienced three bad migraines since the nerve block. (Tr. 710). She rated her pain as eight out of ten, and was experiencing more nausea and vertigo. (*Id.*). Ms. Meyer reported only having taken Topamax for one day, and that the naratriptan did not work. (*Id.*). Dr. Hassett recommended waiting for further intervention until he could see Ms. Meyer's response to the medication, and would potentially consider an occipital nerve block or Botox injections as an option for further treatment. (Tr. 710-11).

On February 14, 2018, Ms. Meyer reported experiencing a migraine for the past five or six days, and she had gone through an entire box of naratriptan without relief. (Tr. 713). She rated her pain at a five on a ten-point scale. (*Id.*). She reported constant fatigue and difficulty concentrating. (*Id.*). She reported having 12-15 migraines per month. (*Id.*). Dr. Hassett ordered an occipital nerve block the following week, and continued Ms. Meyer on naratriptan combined with ibuprofen, Benadryl, hydration, and rest. (Tr. 715). Dr. Hassett started Ms. Meyer on gabapentin and referred her for Botox. (*Id.*). Ms. Meyer was scheduled for Botox treatments in March 2018. (Tr. 719).

---

[3]     Trigeminal neuralgia is indicated by severe bursts of pain in the trigeminal nerve, often induced by trigger points in the mouth. *Trigeminal Neuralgia*, *Stedman's Medical Dictionary* (Nov. 2014).

On May 4, 2018, Ms. Meyer reported she experienced a seven-day migraine four days after the Botox injection. (Tr. 720). At the same appointment, Ms. Meyer also reported approximately 50-60% reduction in the number of headache days, and a reduction in the intensity of her migraines. (*Id.*). Dr. Hassett recommended a repeat of the procedure at three month intervals. (Tr. 720, 722). Dr. Hassett continued Ms. Meyer on gabapentin, and naratriptan combined with ibuprofen, Benadryl, hydration, and rest for abortive therapy. (Tr. 722).

On June 29, 2018, Ms. Meyer received another Botox injection. (Tr. 723-24). At an appointment for trigger injections on July 17, 2018, Ms. Meyer reported drooping in her left eye, daily migraines since the last injection, and pain along the bilateral occipital nerve and trapezius. (Tr. 725). Ms. Meyer reported the headaches lasted all day and medication rarely helped. (*Id.*). Dr. Hassett adjusted Ms. Meyer's medication and increased the gabapentin dosage. (Tr. 725, 727). Dr. Hassett ordered imaging due to Ms. Meyer's poor response to treatment. (Tr. 727).

Treatment notes from August 23, 2018 indicate an unremarkable brain MRI. (Tr. 728). At this visit, Ms. Meyer reported more than 30 headaches since July 17, 2018, and pain at a nine out of ten. (*Id.*). In Dr. Hassett's opinion, Ms. Meyer's complaints were atypical for pure neurologic complaints such as migraine, and, in his opinion, indicated a significant and long-lasting psychiatric condition. (*Id.*). Dr. Hassett indicated in his treatment notes that migraine alone would not necessitate disability. (Tr. 730). At the same time, Dr. Hassett also noted that he considered Ms. Meyer's psychiatric conditions "serious and severe," and the question of disability would be within psychiatry's realm of decision-making. (*Id.*).

On December 22, 2018, Ms. Meyer saw Mark Stillman, M.D., at the Cleveland Clinic. (Tr. 572-76). Ms. Meyer reported a change in her headaches over the past five years, worsening after

delivering her two children. (Tr. 573). In Dr. Stillman's opinion, Ms. Meyer's fibromyalgia and a sleep disorder impacted her headaches. (Tr. 575). Dr. Stillman also indicated she may be suffering from medication overuse triggering her headaches, from the over-the-counter medication and triptans. (*Id.*). Dr. Stillman recommended Ms. Meyer take vitamin B12 and referred her to Dr. Sara Davin regarding the fibromyalgia and depression. (*Id.*).

On January 10, 2019, Ms. Meyer saw Ryan Travis, M.D. (Tr. 581-83). She was experiencing a migraine at this visit and asked for the lights to be turned off. (Tr. 581). Psychiatric progress notes from this visit indicate that depression could be causing or contributing to her physical symptoms. (*Id.*). Dr. Travis indicated Ms. Meyer was seeing a specialist at the Cleveland Clinic and recommended she continue regular therapy with Mark Seymour, LPCC. (Tr. 583-84).

In the next follow-up visits, Dr. Hassett adjusted Ms. Meyer's injection regimen. (Tr. 730, 733, 736). At a March 4, 2019 appointment, Dr. Hassett indicated Ms. Meyer had received treatment through multiple modalities to treat her headaches, neuralgia, and chronic pain without much relief. (Tr. 734). Ms. Meyer rated her pain at seven out of ten. (*Id.*). In Dr. Hassett's opinion, the factors aggravating or relieving her symptoms were unclear; he suspected depression to be the driving force behind her continued complaints of pain. (*Id.*).

On June 27, 2019, Ms. Meyer attended an appointment at the Cleveland Clinic. (Tr. 961-68). Ms. Meyer reported having "really bad migraines back-to-back," with pain rated at seven out of ten, and no headache-free days. (Tr. 965). David Fox, PA-C, recommended Ms. Meyer take magnesium, riboflavin, and coenzyme Q10 supplements. (Tr. 966-67). In addition, Mr. Fox recommended Ms. Meyer try Emgality, a monoclonal antibody injection. (*Id.*). Treatment notes indicate Ms. Meyer was referred to pain psychology. (*Id.*).

Yeshwanth Bekal, M.D., an agency reviewer, reviewed Ms. Meyer's medical evidence at the initial level on November 26, 2018. (Tr. 65-81). Dr. Bekal found that Ms. Meyer had the following severe impairments: fibromyalgia, chronic fatigue syndrome, inflammatory bowel disease, migraine, anxiety and obsessive-compulsive disorders, and depressive, bipolar, and related disorders. (Tr. 72). Dr. Bekal considered Ms. Meyer's symptoms under the following Listings: 12.04 (depressive, bipolar and related disorders); 12.06 (anxiety and obsessive-compulsive disorders); 1.02 (dysfunction of major joints); 11.02 (epilepsy); and 5.06 (inflammatory bowel disease). (Tr. 73). In Dr. Bekal's opinion, Ms. Meyer could not climb on ladders, ropes, or scaffolds, nor could she be exposed to unprotected heights or hazardous machinery due to her migraines and IBS. (Tr. 75-76). In this review, Ms. Meyer was determined able to perform at the light exertional level and was found not disabled. (Tr. 79-80).

Michael Hallet, M.D., reviewed Ms. Meyer's record on March 4, 2019. (Tr. 83-103). Dr. Hallet found Ms. Meyer to have the same impairments as Dr. Bekal had assessed. (Tr. 93; *compare with* Tr. 72). Dr. Hallet also assessed Ms. Meyer's symptoms under Listings 12.04, 12.06, 1.02, 11.02, and 5.06. (Tr. 94-95; *compare with* Tr. 73). Ms. Meyer was again found able to work at the light exertional level, with limitation to no ladders, ropes, or scaffolds, and avoiding exposure to unprotected heights or hazardous machinery. (Tr. 97-98, 102). However, Dr. Hallet found Ms. Meyer limited due to her migraines, IBS, and her chronic fatigue. (Tr. 97-98).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2018.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of February 4, 2016 through her date last insured of December 31, 2018 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: fibromyalgia; migraine headaches; chronic fatigue syndrome; irritable bowel syndrome/gastritis; generalized anxiety disorder; and major depressive disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except postural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional stooping, kneeling, crouching and crawling. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on September 21, 1984 and was 34 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from February 4, 2016, the alleged onset date, through December 31, 2018, the date last insured (20 CFR 404.1520(g)).

(Tr. 17-28).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the

Commissioner can act, without fear of court interference. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is the claimant determined to be disabled. 20 C.F.R.

§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Meyer asserts the ALJ failed to evaluate Ms. Meyer's headache disorder under Listing

11.02, and failed to account fully for Ms. Meyer's migraine headaches in the RFC finding. (Pl.'s

Br., ECF #13, PageID 1347-54). In response, the Commissioner asserts the ALJ properly evaluated

Ms. Meyer's migraines under the Listings and at the RFC stage of the sequential evaluation.

(Comm'r's Br., ECF #15, PageID 1366-72). For the reasons described below, I find the ALJ's

evaluation of Ms. Meyer's headache condition to be within the ALJ's permissible "zone of choice";

thus, I recommend the District Court affirm the ALJ's decision.

## I. Substantial evidence supports the ALJ's finding that Ms. Meyer's migraines did not meet Listing 11.02.

Ms. Meyer contests the ALJ's finding that her migraines did not meet Listing 11.02,

contrary to the requirements of Social Security Ruling ("SSR") 19-4p. (Pl's Br., ECF #13, PageID

1347-49). The Commissioner asserts the ALJ's finding was supported by substantial evidence, and

at Step Three of the sequential evaluation process Ms. Meyer retains the burden to demonstrate

her impairments meet a Listing. (Comm'r's Br., ECF #15, PageID 1366-69).

At Step Three, the ALJ considers the medical severity of the claimant's impairments and

determines whether  the impairment meets or equals a listing in 20 C.F.R. § 404, Subpart P,

Appendix 1. 20 C.F.R. § 404.1520(a)(4). If there is no direct Listing for an impairment, the ALJ

will compare the findings against closely analogous Listings. SSR 17-2p. If the ALJ determines the

impairment does not meet or equal a Listing, the ALJ will make an RFC finding based on all the

relevant medical and other evidence contained in the claimant's case record. *Id.* at § 404.1520(e).

14

There is no Listing for migraines or headache disorders. SSR 19-4p. Rather, SSR 19-4p directs ALJs to evaluate primary headache disorders under Listing 11.02, concerning epilepsy and dyscognitive seizures. *Id.* When evaluating a headache disorder under Listing 11.02B, SSR 19-4p instructs the ALJ to consider: a detailed description of a typical headache event from an acceptable medical source; the frequency of headache events; adherence to prescribed treatment; side effects of treatment; and limitations in functioning that may be associated with the headache disorder or its treatment. *Id.* To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in Listing 11.02D, the ALJ is to consider the same factors from Listing 11.02B, and to consider whether the overall effects result in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. *Id.*

When evaluating a claimant's impairment, the ALJ must provide sufficient explanation for the claimant and any reviewing court to "trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (internal quotations omitted). However, the ALJ is not required to provide an exhaustive account at each stage of the analysis; rather, an ALJ's opinion is read "as a whole and with common sense." *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *13 (N.D. Ohio May 14, 2020), citing *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678 (7th Cir. 2010). An ALJ need not repeat the same analysis at each stage, but must articulate the reasoning enough to permit meaningful review. *Id.*

Here, the ALJ provided only one short sentence discussing SSR 19-4p: "There is no specific listing for headaches, although that diagnosis is referred to in Social Security Ruling 19-4p, but even taken in combination with other impairments, the claimant's headaches do not reach the

15

level of medical equivalence to meet a listing." (Tr. 18). When reading the ALJ's decision as a whole, however, it is apparent that the ALJ considered the medical evidence in the record, Ms. Meyer's subjective complaints, and her functional abilities when determining her headache disorder did not meet Listing 11.02. For example, in the Step Three Listings analysis, the ALJ considers and provides a full paragraph in explanation for each of Ms. Meyer's functional abilities: understanding, remember, or applying information; interacting with others; concentration, persistence, or maintaining pace; and adapting or managing oneself. (Tr. 19-21). Although this discussion is in the context of Ms. Meyer's mental impairments, the ALJ discussed Ms. Meyer's ability to prepare meals, care for her children, drive short distances, shop in stores, and handle her finances. (Tr. 19-20). The ALJ found Ms. Meyer able to do these tasks despite her limitations in concentration, fatigue, and chronic pain—all conditions with overlap between her mental impairments and her complaints of migraine pain. (*Id.*). Finally, the ALJ concludes this section with a blanket statement stating that the medical evidence did not support a finding of Listing-level severity; neither did an acceptable medical source describe findings equivalent to a Listing. (Tr. 21).

Moreover, the ALJ considered Ms. Meyer's impairments due to her migraines in other stages of the analysis. At Step Four, the ALJ discussed the medical opinions of record and Ms. Meyer's subjective symptoms. At this stage of the analysis, the ALJ described Ms. Meyer's symptoms due to her chronic migraines. (Tr. 23). The ALJ described her symptoms in contrast to Ms. Meyer's normal mental status, cranial nerve, sensation, and motor examinations. (Tr. 23). The ALJ also described normal reflexes (with slightly decreased reflexes in the left lower extremity), cerebellar function, and normal gait and station. (*Id.*). The ALJ also noted the neurological reports

in the record showing Ms. Meyer had consistently normal attention, language, intact memory, and fund of knowledge. (Tr. 24). In all, the ALJ determined Ms. Meyer had some limitations due to her migraine headaches but was still able to perform work at the light exertional level, once certain restrictions were included in the RFC. (Tr. 26-27).

Finally, state agency physicians—Drs. Bekal and Hallett—did indeed consider Listing 11.02 in their review. (Tr. 73, 95). In their opinions, they found Ms. Meyer able to perform work at the light exertional level with certain limitations, such as exposure to unprotected heights or ladders, ropes, or scaffolds. (Tr. 74-76, 96-98; *see also* Tr. 25). Drs. Bekal and Hallet did not find Ms. Meyer required other limitations due to her migraines—such as limiting noise. (Tr. 74-76, 96-98). The ALJ considered these opinions and deemed them mostly persuasive, except that Ms. Meyer required additional manipulative and environmental limitations, which he incorporated into the RFC. (Tr. 25). Because state agency physicians are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation," 20 C.F.R. §§ 404.1513a(b)(1), an ALJ may rely on their opinions as substantial evidence. *See Martin v. Comm'r of Soc. Sec.*, No. 18-00005, 2018 WL 6169282, at *11 (N.D. Ohio Nov. 26, 2018). Therefore, substantial evidence supports the ALJ's finding that Ms. Meyer's headache disorder did not meet or equal Listing 11.02.

Although Ms. Meyer is correct in asserting that the ALJ does not directly invoke Listing 11.02 in the analysis, I find that, when read as a whole, the ALJ sufficiently articulated his reasoning in finding Ms. Meyer's headache disorder did not meet or equal a listed impairment.

## II.     The RFC properly incorporated Ms. Meyer's limitations into the RFC evaluation.

Ms. Meyer also argues the RFC does not fully account for the limitations she has as a result of her migraine headaches. (Pl.'s Br., ECF #13, PageID 1349-54). The Commissioner responds

that substantial evidence supports the ALJ's RFC finding. (Comm'r's Br., ECF #15, PageID 1369-72). I agree with the Commissioner.

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1546(c). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery*, 2020 WL 2496917, at *11; *see also* 20 C.F.R. § 404.1545(a)(3). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

An ALJ may also rely on a VE's testimony in reaching this conclusion, so long as it accounts for the claimant's limitations. *Webb*, 368 F.3d at 633. But only the ALJ has the authority to determine a claimant's medical restrictions and the resulting RFC; the VE does not determine which restrictions the claimant has in fact. *Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019). Asking a hypothetical of a VE is not a finding and does not bind an ALJ to a VE's response. *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020). Rather, a VE's

18

response to a hypothetical serves as substantial evidence of the claimant's ability or lack thereof. *Kessans*, 768 F. App'x at 535-36. An ALJ may pose a question regarding a hypothetical individual including several limitations, but later determine the VE's response is not relevant as to the claimant's abilities. *Id.* To require an ALJ to rely on the VE's response to the most restrictive question involving a hypothetical individual would controvert the roles of the ALJ and the VE. *Id.*

Here, the ALJ crafted the following RFC for Ms. Meyer, based on her abilities and limitations due to her impairments:

> [Ms. Meyer has] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except postural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional stooping, kneeling, crouching and crawling. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decision, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

(Tr. 21). The ALJ discussed the evidence he relied on in creating the RFC, namely: opinions from the state agency physicians and psychologists (Tr. 25); opinion evidence from Ms. Meyer's neurologist (Tr. 22-24); Ms. Meyer's subjective symptoms (Tr. 22); and normal CT scans, MRIs, and normal neurological examinations. (Tr. 23). The ALJ compared this evidence against Ms. Meyer's activities of daily living, finding she was able to prepare holiday meals, care for her children, go on family trips to amusement parks, and start her own travel agency. (Tr. 22-27). In all, the ALJ found these activities cut against a finding of disability and represented Ms. Meyer's ability to work at the capacity described in the RFC. (Tr. 26-27).

19

In addition, I find no error with the hypothetical posed to the VE during the hearing. At the hearing, the ALJ posed the hypothetical as follows:

> [A]ssume that a hypothetical individual of the claimant's age, education and work experience has the residual functional capacity for work at the light exertional level, postural limitations of no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, occasional stooping, kneeling, crouching and crawling, manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling and fingering, environmental limitation to avoid concentrated exposure to hazards such as dangerous moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust and gases, work limited to simple, routine and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts involving only work-related decisions with few, if any, workplace changes, occasional interaction with the general public, coworkers and supervisors.

(Tr. 58-59). In my reading, this appears to be based on the limitations posed by the agency reviewers (*compare* Tr. 58-59 *with* Tr. 74-76, 96-98), and includes additional limitations deemed appropriate by the ALJ based on his review of the evidence. The VE responded that such a hypothetical individual would be able to perform work in the national economy. (Tr. 59). In concluding his RFC finding, the ALJ explained the reasons for each limitation included in the RFC. (Tr. 26-27). I find no error in the hypothetical posed to the VE. Substantial evidence supports the ALJ's RFC finding.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB supported by substantial evidence and recommend the District Court **AFFIRM** that decision.

Dated: November 29, 2021

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).